# United States Court of Appeals

## For the First Circuit

No. 01-1330

ROBERT V. SPARKS, d/b/a WATERMARK PROPERTIES,
Plaintiff, Appellant,

v.

FIDELITY NATIONAL TITLE INSURANCE COMPANY and
NATIONS TITLE INSURANCE COMPANY OF NEW YORK,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya Zobel, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and O'Toole,* District Judge

Nelson G. Apjohn, with whom Augustus F. Wagner, Francis R. Powell and Nutter, McClennen & Fish, LLP, were on brief, for appellant.
John H. Henn, with whom Matthew C. Baltay and Foley, Hoag & Eliot, LLP, were on brief, for appellees.

July 1, 2002

_____
* Of the District of Massachusetts, sitting by designation.

**O'TOOLE, District Judge.** Appellant Robert V. Sparks appeals from the district court's grant of summary judgment in favor of the defendants, Fidelity National Title Insurance Company ("Fidelity") and Nations Title Insurance Company of New York ("Nations").[1] Sparks, a real estate broker doing business as Watermark Properties, sued the defendants for failing to compensate him for his efforts on their behalf to sell certain property on Martha's Vineyard. Sparks claims that the defendants breached their brokerage listing agreements with him, misrepresented the extent of their ownership of the property in question, breached an implied covenant of good faith and fair dealing, and committed unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11. After thorough review of the detailed summary judgment record, we affirm the judgment of the district court.

I. Background

The dispute between the parties centers around a 235-acre property situated in Edgartown, Martha's Vineyard, alternatively called "Wintucket Farms" or "Vineyard Acres II." During the time period at issue, the property was zoned and permitted as a 148-lot residential subdivision. As a result of prior title problems affecting land within the development, Nations, and later Fidelity as its successor, acquired ownership of 99 of the lots. Another 45 lots were owned by Nicholas Cambio and his associates, and four lots were owned by the Sheriff's Meadow Foundation, a conservation group.

---

[1] Sparks also appeals the denial of his cross-motion for partial summary judgment.

-2-

In addition, a previous developer of the property, Louis Giuliano, had the right under an agreement with Nations' predecessor to approve the minimum price at which the defendants sold any of the lots in the subdivision, subject to the proviso that he could not unreasonably withhold his approval. Moreover, in a suit he filed against Nations in 1996, Giuliano asserted an ownership interest in the property arising from his dealings with Nations' predecessor. In January 1998, this court affirmed the district court's rejection of his ownership claim. See Giuliano v. Nations Title, Inc., 134 F.3d 361 (table), No. 96-2331, 1998 WL 45459 (1st Cir. Jan. 23, 1998).

Sparks entered into three successive listing agreements regarding the Wintucket Farms property. The first was executed between Sparks and Nations and covered the period from June 27, 1995 through December 31, 1995. In the agreement, Sparks agreed to "use reasonable efforts to procure BUYERS for said PROPERTY, ready, willing, and able to purchase same in accordance with the price, terms, and conditions to be agreed upon." Nations, in turn, agreed to pay Sparks a specified broker's fee for each homesite or home that he sold in the subdivision. Under the agreement, Sparks had the exclusive right to list, represent, and sell the property.

The agreement described the property to be sold as follows:

> This LISTING AGREEMENT covers and includes those lots or homesites and model homes located in the Wintucket Farms subdivision, located in Edgartown on the Island of Martha's Vineyard, off the West Tisbury Road, further identified by the Town of Edgartown's Assessor's Book Map

22, Lots numbered 57 through 210 as shown on a plan drawn by Smith & Dowling, engineers, dated 1982 and filed at the County of Dukes County Registry of Deeds as case file 279 for the Town of Edgartown.

The parties agree that this is a reference to the 148 residential lots that comprise the Wintucket Farms subdivision. The agreement also recited that Nations "represents and warrants that it is the owner of said property."

The second listing agreement, also between Sparks and Nations, covered the period from January 1, 1996 to December 31, 1996, and contained substantially the same terms as the first, with one notable difference. In this second agreement, Sparks agreed to "use reasonable efforts to procure BUYERS for said property, ready, willing, and able to purchase same in accordance with the price, terms, and conditions, described in attachment 'A'." Attachment "A" listed 15 specific lots in Wintucket Farms and named prices for all but three of the identified lots.

The third agreement was executed between Sparks and Fidelity, a corporate affiliate of Nations that had succeeded to its interest in the property. This agreement covered the period from May 1, 1996 to October 31, 1996. It was substantially similar to the second agreement, but different in three significant ways. First, the attachment "A" to the agreement listed 23 lots (including the same 15 listed in the second agreement) and specified prices for all but two. Second, the third agreement provided: "It is understood and agreed that the Seller [Fidelity] shall have the exclusive right to modify the prices on Attachment

-4-

'A' provided it notifies Broker thereof at least ten (10) days before the prices are changed." Third, the agreement stated that if Fidelity were to secure "a single buyer to purchase more than ten (10%) percent of the entire property during the term of this agreement," Sparks would not receive a commission from such sale.

Sparks alleged that during the effective terms of the three listing agreements he made selling Wintucket Farms his full-time job. He closed his office and relocated his business to a model home on the property, and he forewent other brokering opportunities. He attempted both to sell individual lots and to sell the entire property to a single buyer. Over time, he generated and presented to the defendants offers from buyers both for particular individual lots and for the whole property.

None of the offers presented by Sparks for the purchase of individual lots was accepted by the defendants. The closest Sparks came to concluding the sale of an individual lot was an offer in September 1996 by Elizabeth and David Kotek to purchase a lot that had a model home built on it. Although the sale price was acceptable to Fidelity (the owner at the time), Fidelity responded to the Koteks' offer with a counteroffer that insisted on two conditions: Fidelity would have the right to repurchase the property within a year for a stipulated price and the Koteks would agree to accept the subsequent imposition of any covenants, conditions and restrictions that might in the future be placed uniformly on all lots within the subdivision. Fidelity and the

Koteks never settled on final terms and never signed a purchase and sale agreement.

Sparks also located several buyers who made offers to purchase the entire property. These offers ranged in price from $6 million to $13 million and included a variety of additional terms. For example, the offers varied in the size of the down payment and the length of time over which the balance of the purchase price would be paid. The offers were generally contingent on governmental approvals and on the buyer's ability to obtain the necessary financing. In no case was a binding purchase and sale agreement executed between a prospective purchaser and either of the defendants.

The defendants came close to completing a sale of the entire subdivision with only one potential buyer. In 1997, the Osprey Vineyard Trust ("Osprey"), a potential buyer located by Sparks, offered to purchase the entire property for the purpose of developing it into a golf course. Negotiations between Fidelity and Osprey resulted in a draft purchase and sale agreement in which Osprey promised to buy the property for $15 million to be paid if certain contingencies were met. However, Osprey ultimately notified Fidelity that it could not obtain the necessary financing and withdrew the unsigned purchase and sale agreement.

After Sparks' listing agreements with the defendants had expired, Fidelity ultimately sold the subdivision for $15.93 million to Martha's Vineyard Golf Partners ("MVGP"), a buyer not introduced by Sparks. Negotiations between Fidelity and MVGP

began in November 1997, and after several extensions of the closing date, the sale was concluded in July 2000.

## II. Proceedings Below

Sparks filed this action in the Massachusetts Superior Court, and the defendants removed it to the district court on the basis of the parties' diversity of citizenship. See 28 U.S.C. § 1332. The complaint set forth four claims under Massachusetts law. After discovery, the defendants moved for summary judgment on all claims, and the district court granted the motion. The court also denied a cross-motion by Sparks for partial summary judgment of liability on his theory that the defendants had breached a warranty of ownership. The district court determined that under the applicable law of Massachusetts regarding brokers' fees, Sparks had not earned the right to a commission under the listing agreements and therefore the defendants had not breached any of those agreements by failing to compensate him. Similarly, the district court concluded that Sparks could not prove that any alleged misrepresentations or other wrongful conduct by the defendants had caused him any damage, and it ordered judgment for the defendants on all counts.

## III. Standard of Review

We review the district court's grant of a summary judgment motion de novo. See MacDonald v. Cohen, 233 F.3d 648, 651 (1st Cir. 2000). Summary judgment is appropriate only when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c).  In deciding a summary judgment motion, we must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).

### IV.  The Rule of Tristram's Landing and the Right to a Broker's Commission

Since the middle of the nineteenth century, Massachusetts courts repeatedly have been asked to decide disputes about whether a real estate broker had earned a commission.  See Gaynor v. Laverdure, 291 N.E.2d 617, 620 (Mass. 1973) (recounting the history of such cases).  In the middle of the twentieth century, the Supreme Judicial Court ("SJC") recapitulated what was then regarded as the settled rule:

> Through a maze of conflicting facts and confusion of varying circumstances one clear rule has been established and that is that a broker in the absence of special circumstances is entitled to a commission if he produces a customer ready, able, and willing to buy upon the terms and for the price given the broker by the owner.

Henderson & Beal, Inc. v. Glen, 110 N.E.2d 373, 375 (Mass. 1953). Under this rule, "a broker who has procured a customer is not obliged to see that the owner and the customer enter into a binding contract or that the contract, if one is made, is carried out." Gaynor, 291 N.E.2d at 621.

The SJC acknowledged that some might regard the rule as "unduly favorable to brokers," because it would permit the broker to recover a commission even where the buyer failed to consummate the purchase, leaving the owner to sue the buyer for breach of

-8-

contract or for specific performance.  Id. at 622.  This prospect

was tolerable, the court said, because the seller could,

> by appropriate language in his dealings with
> the broker, limit his liability for payment
> of a commission to the situation where not
> only is the broker obligated to find a
> customer ready, willing and able to purchase
> on the owner's terms and for his price, but
> also it is provided that no commission is to
> become due until the customer actually takes
> a conveyance and pays therefor.

Id.  In other words, while the default rule favored brokers, owners

could avoid any possible harshness by getting the broker to agree

to an alternate rule.

In 1975, however, finding it necessary to "clarify"

the law regarding the conditions that would entitle a real estate

broker to recover a commission, the SJC adopted a new rule

that effectively shifted the law's presumptive favor from brokers

to sellers of real estate.  Tristram's Landing, Inc. v. Wait,

327 N.E.2d 727, 731 (Mass. 1975).  The court expressed the new rule

as follows:

> When a broker is engaged by an owner of
> property to find a purchaser for it, the
> broker earns his commission when (a) he
> produces a purchaser ready, willing and able
> to buy on the terms fixed by the owner, (b)
> the purchaser enters into a binding contract
> with the owner to do so, and (c) the
> purchaser completes the transaction by
> closing the title in accordance with the
> provisions of the contract.  If the contract
> is not consummated because of lack of
> financial ability of the buyer to perform or
> because of any other default of his . . .
> there is no right to commission against the
> seller.  On the other hand, if the failure of
> completion of the contract results from the

> wrongful act or interference of the seller,
> the broker's claim is valid and must be paid.

Id. at 731 (citation and internal quotation marks omitted). The court noted that the rule newly articulated "places the burden with the broker, where it belongs." Id. The court later explained that

> the broker is in a better position than the
> seller to protect [his legitimate]
> expectations by including, in the brokerage
> contract, a provision that the broker is
> entitled to its commission when it produces
> a ready, willing and able buyer whom the
> seller, for whatever reason, refuses to
> accept. In the absence of such a provision
> the burden is rightfully placed on the
> broker. . . .

Capezzuto v. John Hancock Mut. Life Ins. Co., 476 N.E.2d 188, 190-91 (Mass. 1985). In other words, brokers could avoid any possible harshness by getting the owner to agree to an alternate rule.

We recount this history to emphasize that the present rule represents a conscious policy decision by the SJC to replace a common law default rule favorable to brokers with a default rule favorable to sellers. In subsequent cases Massachusetts courts have given no indication of any substantial retreat from the requirement that the three conditions outlined in Tristram's Landing must be satisfied in order for a real estate broker to become entitled to a commission for work on behalf of a seller.

Indeed, in Bump v. Robbins, 509 N.E.2d 12 (Mass. App. Ct. 1987), the court unblinkingly acknowledged the reality, harsh perhaps to brokers, that brokerage contracts, "by their very nature, entail a high risk of noncompensation. It is not at all uncommon for a broker to perform services for which he is not

-10-

compensated." Id. at 19 (internal citation omitted). Although the adoption of the Tristram's Landing rule was undoubtedly influenced by concern for infrequent or inexperienced sellers -- such as individual homeowners -- who normally contemplate paying any broker's commission out of the proceeds of the sale, see Tristram's Landing, 327 N.E.2d at 731, the courts have not restricted the application of the rule to such cases but have applied it to sophisticated sellers as well. See, e.g., Hillis v. Lake, 658 N.E.2d 687, 688 (Mass. 1995) (applying rule to seller who was a real estate developer and owner of a construction company); Capezzuto, 476 N.E.2d at 188 (applying rule to seller who was a life insurance company); see also Hunneman and Co. v. LoPresti, 476 N.E.2d 191, 194 (Mass. 1985) (Wilkins, J., concurring) (acknowledging that the rule was designed for the "uninitiated prospective seller" but should be applied to experienced sellers as well because "it is probably more important that the rule of law in cases of this character be clear").

There is a relatively narrow exception to the Tristram's Landing requirements. A broker has an enforceable claim against a seller when a sale is thwarted by "the wrongful act or interference of the seller." Tristram's Landing, 327 N.E.2d at 731; see also Hillis, 658 N.E.2d at 689. That is, a seller may have to pay a commission notwithstanding the absence of a consummated transaction if he "has engaged in bad faith dealing, or some other misconduct which prevents an agreement between the broker's client and the seller, or which suggests a purpose on the part of the seller to

-11-

obtain without payment a profit from the broker's exertions." Capezzuto, 476 N.E.2d at 191 (citations and internal quotations omitted). See also Bump, 509 N.E.2d at 20 (holding that a seller may be liable for a commission if he either wrongfully defaults on his promise to sell the property or if he intends to take advantage of the broker's efforts without paying him any compensation).

To take advantage of this exception, a broker must show more than that the failure to consummate the sale as contemplated was somehow attributable to the seller. Rather, the absence of a completed transaction must be attributable to the seller's "wrongful act or interference." Hillis, 658 N.E.2d at 689 (quoting Tristram's Landing, 327 N.E.2d at 731) (emphasis added). A seller's act that interferes with a sale but is not wrongful will not entitle the broker to a commission.

In Bennett v. McCabe, 808 F.2d 178, 184 (1st Cir. 1987), this court held that a broker would be entitled to a commission under the Tristam's Landing rule where the broker "succeeded in locating a ready, willing, and able purchaser for their property and only [the sellers'] default, due to an inability to convey good title, caused the transaction ultimately to fail." In Bennett, the sellers' default was described as "technical" or "innocent," and not "wrongful." Id. at 183. We concluded that the Massachusetts courts, if confronted with the question presented in the case, would decide to treat an innocent default by a seller the same as a wrongful one and would permit the broker, who had produced a

buyer fully ready, willing and able to complete the transaction, to recover as if the transaction had been completed.

Subsequently, however, the SJC declared that our interpretation of the Tristram's Landing rule in Bennett was "not a correct statement of Massachusetts law." Hillis, 658 N.E.2d at 687-88. The SJC reiterated that Massachusetts decisions "have consistently insisted on wrongful conduct on the part of the seller which undermines completion of the sale as a prerequisite to a broker's recovery." Id. at 689-90. In circumstances like those presented in the Bennett case, the court said, "the broker is not entitled to a commission unless it appears that the closing is prevented by wrongful conduct on the seller's part." Id. at 691.

Conduct is "wrongful" if it is in itself a violation of an existing legal duty or obligation. See Black's Law Dictionary 1606 (7th ed. 1999) (defining "wrongful conduct" as "[a]n act taken in violation of a legal duty; an act that unjustly infringes on another's rights"). A seller's wrongful conduct, accordingly, encompasses unjustified repudiation of a valid purchase and sale contract. See, e.g., Lewis v. Emerson, 462 N.E.2d 295, 300 (Mass. 1984) (finding that broker's commission was due when seller breached valid purchase and sale agreement by refusing without justification to convey property as promised); Lobosco v. Donovan, 565 N.E.2d 819, 821 (Mass. App. Ct. 1991) (holding that repudiation of binding purchase and sale agreement was "wrongful act" under exception to the Tristram's Landing rule). In this case, the defendants never entered into a binding purchase and sale agreement

-13-

with any buyer produced by Sparks or during the period of his exclusive brokership, and there was no breach of any such agreement that could qualify as a "wrongful act or interference."

The exception to the Tristram's Landing rule is limited in another important way as well. To permit recovery by a broker, a seller's "wrongful act or interference" must have upset the completion of a sale that was called for by a binding purchase and sale agreement entered into between the broker's client and the seller. That is to say, the exception is only available when the first two of Tristram's Landing's three conditions are met -- production of a purchaser willing and able to buy on terms fixed by the owner and formation of a binding contract for purchase -- but the third -- actual closing of the sale -- is thwarted by the wrongful conduct of the seller. For the broker to prevail under the Tristram's Landing exception, proof of a binding contract of sale is necessary. "[I]n situations where the seller is responsible for the failure to complete the transaction, no commission is owing unless the seller has signed a binding agreement with the broker's client." Capezzuto, 476 N.E.2d at 190; see also Hillis, 658 N.E.2d at 689-90 (holding that a broker has an enforceable claim when the first two requirements are met but the seller's wrongful act prevents completion of the contract).

Applying these principles to this case, it is clear that Sparks has no cognizable claim to a broker's commission under either the Tristram's Landing rule or its exception. Plainly, he never satisfied the three conditions of the rule itself, and his

arguments have focused on his coming within the exception. As discussed above, to have an enforceable claim under the exception, Sparks must be able to prove that either Nations or Fidelity, having entered into a binding purchase and sale agreement with a buyer produced by him, wrongfully prevented the consummation of a sale that was contemplated by such an agreement. As neither defendant ever entered into a binding agreement with a would-be buyer produced by Sparks, the opportunity offered by the exception is not available to Sparks, even if he could establish some "wrongful act or interference" by either defendant with the consummation of a sale.

Sparks maintains that the defendants wrongfully refused to enter into a binding agreement with any buyer in the first place, and that such conduct ought to be regarded as coming within the exception to the Tristram's Landing rule. We reject that argument for several reasons.

First, the argument rests on a proposition that has not been endorsed by any Massachusetts case. Our task is to apply the law of Massachusetts as we find it, not to alter or extend it. See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). We are especially mindful of that responsibility, after Bennett, in this corner of the law.

Second, to the extent such a proposition has been noticed in the Massachusetts cases, it has been rejected. In Capezzuto, the court observed that "a seller ordinarily expects that he is free to sell to whomever he chooses, until he has signed

a purchase and sale agreement." 476 N.E.2d at 190. In other words, the refusal to sign a binding agreement is not itself a basis for liability. In Hunneman, decided the same day as Capezzuto, the seller refused to accept an offer from the broker's client that apparently met the seller's previously expressed terms. Nonetheless, the court refused to label the seller's refusal as wrongful, noting again that "a seller is ordinarily privileged to sell to whomever it chooses." 476 N.E.2d at 193.

Third, even assuming that Massachusetts would be receptive to it, the principle proposed by Sparks would only excuse the non-occurrence of the second (as well as the third) of the Tristram's Landing conditions. A broker-plaintiff would still have to show that the first condition had been satisfied. Here, for all the proposals he produced, Sparks cannot point to any -- except the Osprey proposal, which was ultimately withdrawn by the buyer -- on behalf of "a purchaser ready, willing and able to buy on the terms fixed by the owner." Tristram's Landing, 327 N.E.2d at 731.

It is true that some of the cases reserve the possibility that a broker may have a claim notwithstanding the non-occurrence of the three Tristram's Landing conditions "where the seller has engaged in bad faith dealing, or some other misconduct which prevents an agreement between the broker's client and the seller." Capezzuto, 476 N.E.2d at 191. Apart from expressing the reservation, however, no case has yet held that a broker is entitled to a commission because the seller had "engaged in bad faith dealing" or "other misconduct which prevent[ed] an

-16-

agreement." See, e.g., Bump, 509 N.E.2d at 19-20 (discussing "bad faith" reservation, but finding it inapplicable); see also Bonin v. Chestnut Hill Towers Realty Corp., 466 N.E.2d 90, 97-98 (Mass. 1984)(same).

It appears that the bad faith reservation can be traced to pre-Tristram's Landing broker's fee cases, represented by Kacavas v. Diamond, 20 N.E.2d 936 (Mass. 1939). See Bonin, 466 N.E.2d at 97 (quoting extensively from Kacavas). In Kacavas, a business broker sued for a commission, claiming that he had originally introduced the successful buyer and was thus the "efficient cause" of the ultimate sale, though the sale terms were not agreed upon until after the intervention of a second broker. 20 N.E.2d at 937-38. The plaintiff-broker alleged that the owner had acted in bad faith by employing the second broker in order to avoid paying him a commission. In rejecting the argument, the SJC rehearsed the principles that would guide a determination of "bad faith" in this context:

> It is settled that a liability to pay the broker's commission may . . . exist in consequence of unethical conduct of the employer which results in preventing full performance by the broker although the benefit which the employer sought from the broker's exertion is obtained by him. Unethical conduct or bad faith in a case such as the present one means a purpose on the part of the defendants to obtain without payment a profit from the plaintiff's exertions. Bad faith exists where the employer revokes the broker's authority or makes the sale through other means when the broker has performed all he has undertaken, or is plainly or evidently approaching success in his undertaking.

-17-

Id. at 938 (citations and internal quotations omitted).  At the time, a broker had given "full performance" when he produced a buyer "who was ready, able and willing to purchase" on the seller's terms, regardless of whether the sale was consummated. Id. at 937-38.  In this context, obtaining the benefit of the broker's exertions without paying him meant, for example, contriving to complete the sale to the broker's client without paying the broker a commission, which is essentially what the plaintiff was claiming in Kacavas.

Similarly, in Bonin, the plaintiff brokers alleged that the owner of real estate had acted in bad faith by secretly dealing with a syndicator originally introduced by the brokers with the purpose of evading payment of a commission.  466 N.E.2d at 97. Quoting Kacavas, the court rejected the argument.  Id. at 97-98. In language that could be applied to Sparks' situation, the court noted that "the plaintiffs continued to bring prospects to the defendants.  There was no showing that the defendants prevented the plaintiffs from performing under their contract to produce a buyer for the property."  Id. at 98.

In Bump, the Massachusetts Appeals Court elaborated further on the "bad faith" basis for liability:

> There are two lines of authority relevant to Bump's claim of bad faith revocation.  The first is based on the notion that the Tristram's Landing requirement of a completed transaction is not applicable where a seller wrongfully defaults.  To recover on this theory, Bump would have to have shown at the very least that he had produced a customer ready, willing, and able to purchase [the

-18-

> business] on acceptable terms. His efforts
> . . . yielded results far short of that
> accomplishment.
>
> In the second group of cases, recovery is
> based upon a purpose on the part of the
> seller to obtain without payment a profit
> from the broker's exertions when the broker
> has performed all he has undertaken, or is
> plainly or evidently approaching success.
> Bump's evidence does not bring his claim
> within the principles of these cases. Even
> if it could be said that he was approaching
> success with [a particular buyer], there is
> no evidence that the defendants were
> attempting in any way to take advantage of
> Bump's efforts with [that customer] without
> paying him a commission.

509 N.E.2d at 20 (citations and internal quotations omitted).

Review of the cases thus leads to the conclusion that the "bad faith" reservation is narrowly focused, or, as the Bump court put it, "limited." Id. As the excerpt from the Bump opinion points out, "bad faith" in this context is a coordinate alternative to a "wrongful act or interference." After Tristram's Landing, for a broker's claim for a commission to be viable, the effect of any alleged bad faith must be, as must be the effect of any "wrongful act or interference," to prevent the consummation of a sale to which the buyer and seller have agreed.

There is nothing in the summary judgment record that indicates that either Nations or Fidelity dealt with Sparks in bad faith as the relevant cases use that term. There is no evidence that Sparks had done everything required to earn a commission -- which, under Tristram's Landing, would require at the very least producing a buyer ready, willing and able to purchase on terms

-19-

established by the seller -- but that by some evasive tactic, the defendants maneuvered out of paying the commission.  The evidence might support a finding that the defendants stubbornly refused to accept objectively reasonable offers presented by Sparks, but that would not prove the necessary bad faith.  Until a seller commits in a binding contract to particular terms, the seller is free to set the terms upon which it will sell.  See Capezzuto, 476 N.E.2d at 190.  Unless he specifically agrees to do so, the seller has no obligation to accept even objectively reasonable terms offered by a buyer.  To conclude otherwise -- to equate bad faith with the rejection of an objectively reasonable offer -- would effectively reverse the Tristram's Landing rule.  It would permit a broker to recover a commission by proving that he had produced a buyer ready, willing and able to purchase on objectively reasonable terms, without proving any of the three conditions laid down in Tristram's Landing.  The Massachusetts courts, we can confidently say, would not permit the exception thus to swallow the rule.

For these reasons, Sparks had no right to a broker's commission, and the district court properly granted summary judgment on his claim that Nations and/or Fidelity breached any of the listing agreements by failing to pay him a commission.

V.  Alternate Theories of Relief

Sparks also claims that the defendants misled him in various ways and that, thus misled, he wasted time and effort trying to find buyers for the property.  He advances a variety of factual allegations in this regard.  His principal argument is that

-20-

both Nations and Fidelity falsely represented that they owned the full Wintucket Farms property when they did not.  Each of the listing agreements recited that the seller, Nations or Fidelity as the case may be, "represents and warrants that it is the owner of the property."  Sparks claims that representatives of the defendants repeated the misrepresentation orally during the course of his dealings with them.  In fact, these representations were false because the defendants only owned 99 of the lots in the subdivision, while Cambio owned 45 lots, and 4 were owned by the conservation group.  Sparks says that he relied on the representations of ownership in undertaking to try to find buyers for the property and asserts that he would not have done so if he had known the truth.

He also alleges that the defendants withheld from him the information that Giuliano had a right to approve the sales prices for lots in the development.  Again, he asserts, he would not have engaged to try to find buyers if he had known that fact.  In addition, he claims that Giuliano's refusal to approve the sale price caused Fidelity to reject the offer from the Koteks to purchase one of the model homes.  Sparks presents these claims by asserting causes of action based on theories of breach of warranty, misrepresentation, breach of an implied covenant of good faith and fair dealing, and unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A.

A. Breach of Warranty

Sparks asserts that in the listing agreements Nations and Fidelity each made an express warranty of ownership of the full Wintucket Farms property. Because the warranty was literally false when it was made, Sparks argues that the defendants are liable for breach of the warranty under contract law principles.[2] We disagree.

In the first place, it is doubtful whether the statement in the listing agreement constitutes an express warranty in favor of Sparks at all. Under Massachusetts law, as elsewhere, an express warranty in a contract is a promise of a particular standard of performance, and it imposes on the warrantor an obligation to fulfill the promise made. See Coca-Cola Bottling Co. of Cape Cod v. Weston & Sampson Eng'rs, Inc., 695 N.E.2d 688, 694 (Mass. App. Ct. 1998)(noting that an express warranty sets a standard of performance). In the event of a breach, the warrantee may bring a contract action for damages. See Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 489 N.E.2d 172, 175 (Mass. 1986)(finding that a claim for breach of express warranty is an action of contract). In effect, the warrantor proposes to indemnify the warrantee for any damage resulting from a variation between what was promised and what actually came to pass. See Carolet Corp. v. Grafield, 157 N.E.2d 876, 878 (Mass. 1959).

---

[2] This argument formed the basis for his cross-motion for partial summary judgment as to liability under the breach of contract count.

It is difficult to see how the "warranties" in the listing agreements constituted a promise of performance for Sparks' benefit. They were, at most, assurances that if Sparks found a buyer for the whole property, the seller would be able, because it owned the property, to convey it. Indeed, Sparks himself does not characterize the statements as being promises of performance, nor can his damages claim fairly be characterized as one for indemnification. Rather, he contends that he relied upon the defendants' false assertions of complete ownership in deciding to commit his efforts to selling the property. That claim is appropriately classified as one for misrepresentation, discussed in the next section.

Even if the statements could be understood as promises of performance, however, they clearly were contingent and contemplated performance at some uncertain time in the future. The defendants' obligations under the warranty would not accrue until Sparks had fulfilled the Tristram's Landing conditions by presenting a buyer offering terms acceptable to the seller who had entered into a binding purchase and sale agreement. There was no breach of warranty simply because at some time the assertion that the defendants owned the entire property was not true. The breach would occur only if at the necessary time the statement was untrue, and the promised performance was not forthcoming. Although we may be expressing it somewhat differently, the district court essentially made the same ruling in concluding that Sparks could

not prove that any breach of warranty was the cause of any damage to him, a matter to which we now turn.

                   B.   Misrepresentation of Ownership
                        of Entire Subdivision

The district court concluded that, assuming for purposes of the summary judgment motion that the defendants had misrepresented the extent of their ownership of property in the subdivision, Sparks could not prove that the deception was the cause of any injury or damage to him.  We agree.

We assume for this discussion that but for the representation in each of the listing agreements that the defendants owned the entire property, Sparks would not have entered into the brokerage relationship with the defendants and would not have devoted time and expense to the effort to sell either individual lots or the entire subdivision.  But the fact that the defendants' misrepresentations caused him to enter into a business relationship with them does not prove that the misrepresentations were the cause of Sparks' lack of success in brokering the property and thus the cause of any consequent economic damages.  The evidence in the record does not permit the conclusion that the fact that Cambio owned 45 lots prevented Sparks from presenting, or the defendants from accepting, any particular offers to purchase. While any sale of the entire property would require Cambio's cooperation, the need to include his lots in any sale certainly did not make it impossible to sell the entire subdivision or futile for Sparks to try to find a buyer whose offer would be accepted.  After

-24-

all, ultimately the entire subdivision was sold, with Cambio's cooperation.

Even if Sparks had been induced to undertake his brokering efforts by a misrepresentation, he might still have succeeded, notwithstanding the falsity of the representation of ownership, if he had produced the right offer. Indeed, he came close. The Osprey offer produced by Sparks would have earned him a commission had it not been withdrawn by the purchaser. At the time it was withdrawn, deeds for the conveyance of Cambio's lots as part of the transaction had been executed and were held in escrow. Neither Cambio's ownership nor any other condition or factor on the seller's side stood as interference to the completion of that sale.[3] It might be a different story if Sparks had produced an offer viable in all other respects that would have proceeded to a consummated sale but for the fact that the defendants could not deliver the whole subdivision. See Discover Realty Corp. v. David, 731 N.E.2d 79 (Mass. App. Ct. 2000). There is no evidence in the record, however, of such an offer.

### C. Nondisclosure of Giuliano's Right to Approve Sales Prices

Sparks also claims that he was misled into undertaking his brokering efforts on behalf of the defendants because they withheld from him the fact that Giuliano had a qualified right to approve the prices at which individual lots would be sold. The

---

[3] Similarly, Camio's ownership in some lots in the subdivision played no role in the failure of the Koteks' offer for an individual lot, because the lot in question was owned by Fidelity.

defendants respond that they were under no obligation to disclose such information to Sparks.

The approval right in question stems from a settlement agreement between Nations' predecessor, TRW, and Giuliano, dated March 21, 1991. Pursuant to that agreement, Giuliano and his partner agreed to transfer certain property interests in Wintucket Farms to TRW in exchange for a cash payment and the right to receive the amount by which proceeds from the sale of lots in the subdivision exceeded TRW's "sunk costs." The agreement included the following undertaking by TRW to develop the subdivision: "TRW will market and sell the lots at retail, at offering and minimum prices consistent with market conditions, the prices being subject to [Giuliano's] approval, which will not be unreasonably withheld."

Under Massachusetts law, Nations was not obliged to disclose Giuliano's right to approve minimum sales prices. Because the relationship between Nations and Sparks was at arm's length, it did not give rise to any affirmative obligation to disclose what criteria Nations would apply in deciding whether, and on what terms, to sell any of the lots. See Nei v. Burley, 446 N.E.2d 674, 676-77 (Mass. 1983)(stating that no duty to disclose exists when two parties negotiate a deal at arm's length). In the absence of a specific duty to disclose, a seller is not liable for an omission of information. See Greenery Rehab. Group, Inc. v. Antaramian, 628 N.E.2d 1291, 1294 (Mass. App. Ct. 1994)(noting that in absence of affirmative duty to disclose a weakness in the subject of a transaction, nondisclosure of such information "is not a

conventional tort of any kind"); see also DePasquale v. App, 542 N.E.2d 309 (Mass. App. Ct. 1989) (rescript)(finding no actionable misrepresentation where seller failed to disclose to broker existence of right of first refusal that prevented sale to broker's client). In this respect, Massachusetts follows the general principles summarized in the Restatement of Torts. See Restatement (Second) of Torts § 551.

Moreover, the right to approve minimum sales prices could not reasonably be construed as granting Giuliano an ownership interest in any of the lots, so the defendants had no duty to qualify their ownership representations in the listing agreements by disclosing Giuliano's price approval right. The cases cited by Sparks that relate to the duty to speak completely about a subject one chooses to broach are inapposite. See Greenery Rehab., 628 N.E.2d at 1294.

Whether or not Giuliano's refusal to give his approval actually prevented the consummation of any particular sale, and thus prevented Sparks from earning a commission on the sale,[4] is immaterial in the absence of a disclosure duty.

D. Breach of Implied Covenant of
Good Faith and Fair Dealing

To the extent that Sparks' count alleging breach by the defendants of an implied covenant of good faith and fair dealing seeks to recover a commission, it lacks merit for the reasons

---

[4] There is some evidence that Giuliano's insistence on a higher price may have been a factor in the failure of Fidelity to come to terms with the Koteks for the sale of the model home.

-27-

previously discussed.  See supra § IV, at 8-21.  An implied covenant of good faith and fair dealing imposes on the parties the obligation, once they have exchanged mutual promises of performance, to act in good faith to accomplish the purposes of their agreement.  See Druker v. Roland Wm. Jutras Assocs., Inc., 348 N.E.2d 763, 765 (Mass. 1976).  It does not, however, add new substantive obligations to their contractual undertakings.  Here, the parties' listing agreements did not exclude, and therefore included as a matter of law, the Tristram's Landing prerequisites to the earning and payment of a commission.  An implied covenant of good faith and fair dealing does not lessen the broker's responsibility under the contracts, nor does it limit the seller's freedom to set the terms it wants or to reject offers that it finds unsatisfactory.  Just as there was no "bad faith" in the sense of the Tristram's Landing exception in failing to accept offers produced by Sparks, there was no absence of good faith or fair dealing in the same exercise of what the cases recognize as the legitimate prerogative of the seller until a binding agreement for sale has been concluded.

E.  Unfair or Deceptive Acts or Practices

Chapter 93A of Massachusetts General Laws creates a broad prohibition against "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.  While Sparks correctly asserts that he does not have to succeed on either his tort or contract law based claims to qualify for relief under chapter 93A, he must show that Nations or Fidelity

engaged in "conduct which is (1) within at least the penumbra of some common-law, statutory, or other established concept of unfairness; [and] (2) is immoral, unethical, oppressive, or unscrupulous." Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979)(citations and internal quotations omitted).

To argue for liability under chapter 93A, Sparks relies heavily on Bump, 509 N.E.2d at 12. In that case, a business broker brought suit after he discovered that a business he was attempting to sell was about to merge with another company. Id. at 15. The defendants had been in serious negotiations about the merger even before they hired the business broker, but they did not reveal their plans to the broker until the merger was almost complete. Id. at 16-17. The defendants also deliberately misrepresented the value of their company to the broker. Id. at 22. The Massachusetts Appeals Court concluded that the broker was entitled to recovery under chapter 93A because the defendants' conduct induced the broker to spend "time and money in a futile effort to sell a company that was worthless and, as a practical matter, not even available for sale." Id.

It is important to note in Bump the court did not permit the broker to recover a commission. The court held that the broker's efforts "yielded results far short" of meeting the three Tristram's Landing requirements, and that he could not fit within any exception to those requirements. See id. at 20. Nevertheless, the court permitted the broker to sue under chapter 93A for what

-29-

was essentially a kind of quantum meruit remedy for "out-of-pocket expenditures for travel and long-distance telephone calls, time spent at meetings and in other related activities, and the usual charges Bump made for his time." Id. at 22.

The peculiar facts in Bump prevent it from being useful precedent on Sparks' behalf. There, the finding that the defendants were liable for unfair practices depended on the factual findings that the broker was induced to try to sell land that was "worthless" and not genuinely available for sale. Id. In contrast, the land Sparks was engaged to sell was clearly valuable, and available for sale. Moreover, unlike the broker in Bump, Sparks cannot show that the defendants induced him to pursue a course of conduct that was "futile." Admittedly, the sale of Wintucket Farms was not easy to accomplish, but it clearly was not impossible, as was evidenced first by the near success of the Sparks-sponsored Osprey deal and then by the ultimate sale to MVGP.

It would be a mistake, we think, to interpret Bump as creating a new exception to the Tristram's Landing rule. In effect, Sparks invokes Bump to argue for a broker's right to recover damages for wasted time and expense in circumstances where recovery under the brokerage contract is foreclosed by the Tristram's Landing rule. In the first place, it is doubtful that the Bump court itself would have viewed its opinion as opening that door; the opinion hewed close to the factual findings of the trial judge, and did not purport to be announcing a hitherto unannounced avenue for compensating a broker who had not earned a commission

under his brokerage agreement.  Even if that was the essay of the Bump court, we have reason to doubt, given the SJC's rather firm and enduring adherence to the Tristram's Landing rule, see Hillis, 658 N.E.2d at 691-92, that such a holding would be consistent with the body of Massachusetts law on the matter and thus would command our allegiance.  After all, in Tristram's Landing the SJC said that a broker has no right to payment for his efforts unless and until he has located a buyer whom the seller formally accepts, the buyer and the seller sign a binding contract, and the parties complete the transaction.  The court allowed a limited exception for circumstances in which the seller wrongfully thwarts the completion of an agreed sale, but it certainly did not suggest that a broker who had worked hard but had been unsuccessful because the seller never accepted any offer produced by the broker could nonetheless be paid for his time and expenses in that effort.  Indeed, as the Bump court itself recognized, the Tristram's Landing rubric makes very real the prospect that a broker would go without compensation for genuine and substantial efforts on behalf of the seller. See 509 N.E.2d at 20.

Sparks also attempts to analogize his situation to that of the broker-plaintiff in Discover Realty, 731 N.E.2d at 79.  In that case, the seller misrepresented to the broker that he had obtained certain releases from abutters to his property.  Id. at 81.  The trial court found that "the seller had engaged in 'wrongful conduct' by misrepresenting the status of the three releases to the broker at the time the listing agreement was

-31-

executed and at the time the purchase and sale agreement was entered into." Id. Importantly, however, the court went on to conclude that the broker was owed a commission because the seller's misrepresentation had prevented the completion of the sale after the buyer and seller had entered into a contract. Id. In contrast, none of Sparks' buyers ever entered into a binding agreement with the defendants. Sparks did not earn a commission because the defendants did not accept any of the offers he produced, not because the defendants' wrongful or legally unexcused behavior prevented the completion of an agreed sale.

VI. Conclusion

In sum, the substance and policy of the Tristram's Landing rule dictate that Sparks' tort and statutory claims fail for the same reasons as his breach of contract claim. Sparks never produced a buyer willing to purchase either the entire subdivision or any particular lot on terms set by the seller (with the exception of the Osprey offer, which might well have been completed had not the purchaser withdrawn). Nor was there ever a binding purchase and sale agreement concluded between a potential buyer and the defendants. Nor did the defendants, through bad faith or other wrongful conduct, prevent the consummation of any sale. Even if the defendants wrongly represented in the listing agreements that they owned the entire property, the fact that they did not cannot be shown to have interfered with any sale. Finally, Massachusetts law does not countenance a quantum meruit claim by a broker for his time and services when the conditions established by Tristram's

<u>Landing</u> and subsequent cases have not been met.  The judgment of the district court granting summary judgment in favor of the defendants on all counts of the complaint and denying the plaintiff's motion for partial summary judgment is <u>affirmed</u>.