Frison, Shannon, J.
1) Plaintiff Ria K. McNamara, Inc. (“McNamara, Inc.”), is a duly authorized and licensed real estate broker in the Commonwealth of Massachusetts.
2) Ria K. McNamara (“McNamara”) is the sole principal of Ria K. McNamara, Inc.
3) As of August 2006, Ria had atleast eighteen years of experience in the commercial retail real estate industry and, as of the date of trial, tweniy-flve years of overall experience in said industry.
4) Jefferson Shrewsbury Limited Partnership (hereinafter “Jefferson”) is a limited liability partnership organized under the laws of the Commonwealth of Massachusetts.
5) At all times relevant hereto, Joshua Katzen was a duly authorized principal, officer, and/or agent of and for Jefferson.
6} As of August 2006, Katzen had over twenty years of experience in the commercial retail real estate industry and, as of the date of trial, had over twenty-five years of overall experience in said industry.
7) At all times relevant hereto, Katzen was a licensed real estate broker in the Commonwealth of Massachusetts, having obtained his broker’s license in 1984.
8) At all times relevant hereto, Katzen was a licensed attorney in the Commonwealth of Massachusetts, having obtained his license as a member of the Massachusetts Bar in December 1979.
9) Both McNamara and Katzen had extensive knowledge and experience in the commercial retail real estate industry, qualifying both of them as sophisticated in said industry.
10) Jefferson Shrewsbury Limited Partnership (Jefferson) is the owner of the real property known as and located at 77 Boston (Worcester) Turnpike, Shrews-bury, Massachusetts—Quinsigamond Plaza.
11) Quinsigamond Plaza (“Q Plaza”) is a retail shopping center comprised of various separate buildings, containing retail and other consumer businesses.
12) In the 1990s, McNamara had worked with Q Plaza (Jefferson and/or Forecast) and Katzen, having provided commercial retail brokerage services to Q Plaza.
13) In or about July or early August 2006, Katzen contacted McNamara about providing commercial retail brokerage services to Q Plaza, specifically finding a tenant for the space occupied by the Ski Market store.
14) At that time, Ski Market, an existing tenant of Jefferson, was in financial trouble, had defaulted on its lease, and was looking to give up its space if a substitute tenant could be found.
15) At all times relevant hereto, Trader Joe’s occupied the space next to the Ski Market space and was a tenant therein pursuant to a lease with Jefferson. Almost from the inception of Trader Joe’s initial lease on or about June 30, 1999, Katzen made regular and repeated inquiries to Trader Joe’s about taking more *367 space in Q Plaza and increasing the original size of their location.
16) Sharrock is currently the Vice President-Real Estate for Trader Joe’s, having held various real estate positions with Trader Joe’s for twelve years.
17) Since 1999, Sharrock has been responsible for the Q Plaza Trader Joe’s location and his primary contact on behalf of the Landlord Jefferson during that time has been Katzen.
18) The lease between Jefferson, as landlord, and Trader Joe’s, as tenant, as same has been amended from time to time, does not and never did contain a right of first refusal on any space at Q Plaza, specifically including the Ski Market space.
19) Between January 2005 and August 2006, Katzen would regularly contact Trader Joe’s and offer the remainder of the Ski Market space to Trader Joe’s, but Trader Joe’s continuously refused it. Since Trader Joe’s had steadfastly refused to take the remainder of the Ski Market space, in July 2006, Katzen contacted McNamara about acting as the broker to lease the Ski Market space.
20) Katzen informed McNamara that, despite his regular efforts to get Trader Joe’s to take the rest of the Ski Market space, Trader Joe’s was not taking it and he wanted to get it rented to a third party.
21) In July 2006, the Ski Market space was the only space that was available in Q Plaza, as all other space in Q Plaza was leased and no other tenants were in the same financial situation; therefore, the Ski Market space was the only space that McNamara could have been retained to lease at that time.
22) The Listing Agreement was initially drafted by McNamara and then negotiated by Katzen and McNamara prior to its execution by the same.
23) Pursuant to the Listing Agreement:
a. Owner agrees to refer all inquiries and offers for the property to Broker and to cooperate with the Broker in furnishing complete and accurate information about the Property to enable a lease. Owner shall also list the Broker by name in Lease Agreement.
24) Katzen made two changes to the Listing Agreement: (a) he changed when commissions were paid from 50% upon signing the lease to 100% upon tenant paying rent and (b) added that the owner has the sole right to accept or reject offers from Lessees.
25) The Listing Agreement provided that no commission or fee would be due from Jefferson Shrews-bury to McNamara unless a tenant procured by McNamara paid rent to Jefferson Shrewsbury, at which point the commission or fee would be due in fufi.
26) The Listing Agreement gave McNamara the sole and exclusive right to market the property at Q Plaza.
27) Katzen continued to regularly contact Trader Joe’s and offer it the Ski Market space after retaining McNamara.
28) The Listing Agreement between McNamara and Katzen does not address whether or not McNamara wifi be paid a commission or other fee for brokering a deal for the Ski Market space with existing tenants at Q Plaza.
29) McNamara and Katzen have worked together in the past on many real estate deals, and were working on other deals together while McNamara worked on the Q Plaza space as well.
30) McNamara and Katzen have a course of dealing over the years which clarifies the ambiguity of the Listing Agreement as to brokering a deal with an existing tenant. In March 2009 McNamara sought a full commission for a lease she negotiated with a Bollywood store for Katzen. In a March 31, 2009 email, Katzen refused to pay her full commission stating that their “usual practice is to pay a 50% fee when our listing broker makes a deal with an existing tenant.”
31) In that same email Katzen stated that, going forward, if McNamara were to renegotiate a lease with an existing tenant, then a 50% commission would be due to McNamara. “Future dealings with existing tenants would earn a 50% fee.”
32) Katzen was aware that Trader Joe’s prefers not to have medical use tenants within 250 feet of their location in a shopping center as such medical use takes up parking and is not a good retail neighbor for Trader Joe’s.
33) On or about June 11, 2008, Katzen emailed McNamara and suggested putting up a “Medical Space for Lease” sign on the Route 9 side of Q Plaza to get the attention of doctors traveling to U Mass Medical Center.
34) McNamara immediately complied with Katzen’s “medical use” sign request.
35) After almost three years of continuously marketing the Ski Market space for Jefferson, by and through Katzen, in June or July 2009, McNamara was contacted by Gokulan Thiagarajah (“GTj of New England Dental Group (“NEDG”).
36) Between August 5 and August 31, 2009, letter of intent/lease negotiations went on between GT/NEDG and Katzen, with McNamara intimately involved in all facets of same.
37) On September 1, 2009, Katzen emailed McNamara and told her “I believe that we can live with GT’s 8/28 proposal.”
38) On September 16, 2009, McNamara emailed Katzen, informing Katzen that GT/NEDG had inquired about the status of the proposal and asking when Katzen would get back to them, to which Katzen replied “we will make the deal with GT...”
*368 39) As of no later than October 21, 2009, the lease between GT/NEDG and Jefferson had been fully negotiated, drafted, and presented to Katzen for signature. There was nothing left to do, but for Katzen to sign the lease with GT/NEDG.
40) Despite the fact that the GT/NEDG lease was done, except for the execution thereof, Katzen emailed McNamara on October 21, 2009, and stated:
Trader Joe’s has asked for two more weeks to decide on their right of first refusal, which I need to give them. I don’t know what they are thinking, since they’ve repeatedly said “no” in the past, but I have to give them the time.
41) McNamara responded by email within less than an hour stating: “I never spoke to GT about Trader Joe’s first right of refusal because you told me they always said ‘no’ to another expansion . . .”
42) In or about October 2009, Katzen notified Trader Joe’s that he had a potential tenant to take the Ski Market space, that it was a medical use, and that if Trader Joe’s wanted the space—"now is the time, otherwise, it is gone."
43) In light of Trader Joe’s dislike of medical use space next to it and after approximately four-and-a-half years of refusing the Ski Market space, Trader Joe’s decided to take the Ski Market space.
44) Jefferson entered into a written lease amendment with Trader Joe’s in May 2010.
45) Katzen did not allow McNamara to broker the amendment with Trader Joe’s.
46) A written Letter of Intent was never executed between NEDG and Jefferson Shrewsbury, and NEDG never took possession of any space at Q Plaza.
47) NEDG never paid any rent to Jefferson Shrews-bury for any space at Q Plaza.
48) The Jefferson lease with Trader Joe’s began at double the per square foot rental rate that Jefferson would have received from NEDG. The NEDG lease at $17.00 per square foot; the Trader Joe’s lease at $33.85 per square foot.
RULINGS OF LAW
Broker’s Commission
Robert V. Sparks v. Fidelity National Title Insurance Company, 294 F.3d 259 (2002), provides the basic law to be applied in brokerage situations. The long established rule from Tristram’s Landing, Inc. v. Wait, 367 Mass. 622, 327 N.E.2d 727 (1975), is restated:
When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his ... there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker’s claim is valid and must be paid.
Sparks, supra, at 266.
There are, however, exceptions. A broker will be .entitled to a commission where (i) the seller commits a wrongful act or interference (bad faith dealing), and (ii) there existed a signed binding agreement between the seller and the broker’s client. And, there is an exception that does not require such a signed agreement:
It is true that some of the cases reserve the possibility that a broker may have a claim notwithstanding the non-occurrence of the three Tristram’s Landing conditions “where the seller has engaged in bad faith dealing, or some other misconduct which prevents an agreement between the broker’s client and the seller.”
Id. 269.
In John G. Capezzuto v. John Hancock Mutual Life Insurance Company, 394 Mass. 399, 476 N.E.2d 188 (1985), the SJC established the above exception cited in Sparks, requiring that, even when the seller is responsible for the failure to complete the transaction, there must be a binding agreement with the broker’s client. Id. 402-03, 190. But in Capezzuto the SJC expressly acknowledged a further exception:
We recognize that the rule we set forth today may not be applicable where the seller has engaged in bad faith dealing, or some other misconduct which prevents an agreement between the broker’s client and the seller, see Tristram’s Landing, supra at 629, 327 N.E.2d 727, or which suggests “a purpose on the part of the [seller] to obtain without payment a profit from the [broker’s] exertions.”
Id. 404, 191.
In Barbara M. Bump v. Robert Robbins, 24 Mass.App.Ct. 296, 509 N.E.2d 12 (1987), the Appeals Court recognized that a broker’s heightened risk does not come without any legal protection from sellers.
In the second group of cases, recovery is based upon “a purpose on the part of the [seller] to obtain without payment a profit from the [broker’s] exertions . . . when the broker has performed all he has undertaken, or is plainly or evidently approaching success ...”
Id. 307, 20.- This limited right afforded to a broker to recover a commission in such circumstances “reflects a recognition of the risks inherent in the ordinary broker-client relationship.” Id. 308, 20.
Preponderance of the Evidence
The standard of proof in a civil case is that a plaintiff must prove their case by a preponderance of the *369 evidence. In a civil case, the party bearing the burden of proof meets the burden when they show it to be true by a preponderance of the evidence. The standard of a preponderance of the evidence means the greater weight of the evidence. A preponderance of the evidence is such evidence which, when considered and compared with any opposed to it, has more convincing force and produces a belief that what is sought to be proved is more probably true than not true. Sargent v. Massachusetts Accident Co., 307 Mass. 246, 250 (1940). See also Lisbon v. Contributory Ret App. Bd., 41 Mass.App.Ct. 246 (1996).
In this case, the plaintiff McNamara has met her burden to prove by a preponderance of the evidence that Katzen breached the contract and then sought to profit from her work and exertions without paying her a commission for her services. McNamara performed all duties required of her by the Listing Agreement over the course of more than three years. It is true that McNamara did not ultimately provide the tenant for the space, which she was hired to do. But her failure to seal the deal with NEDG was directly and solely due to the actions of the lessor Katzen. Katzen’s actions (1) requesting that McNamara attract a medical use tenant when he knew that such would be disagreeable to Trader Joe’s; (2) Once NEDG made an offer and was ready and willing to sign the lease, Katzen baited Trader Joe’s to take the space using the leverage of a prospective medical use tenant moving in next door to them. Although Katzen reserved the right to accept or reject all offers in the Listing Agreement, he may not actively work against McNamara by using her efforts to obtain a bona fide new tenant to leverage an existing tenant into the space without allowing McNamara to broker that deal. That is precisely the type of bad faith dealing and misconduct contemplated by the exceptions to the rule. Katzen did not allow McNamara to broker a deal with Trader Joe’s. Even if he, as the lessor, preferred the existing Trader Joe’s expansion over that of a new NEDG tenancy—it was his duty per the Listing Agreement to allow McNamara to broker that deal and receive a reduced 50% commission (as indicated by Katzen himself as their custom and practice when it relates to existing tenants). Katzen did not do that, and thereby breached the Listing Agreement between him and McNamara.
JUDGMENT
Based on the above, judgment shall enter in favor of the plaintiff McNamara and against the defendant Katzen as to Count I (Breach of Contract) for a total of $19,466 (Nineteen Thousand Four Hundred Sixty-Six Dollars) plus interest and costs. The plaintiff failed to prove all other counts (II. Third Party Beneficiary, III. Fraud, IV. Quantum Meruit, and V. 93A). As to Count VI, no other declaratory relief other than the above judgment is granted. So ordered.